Haywood, Judge.
This action is brought by the plaintiff, an indorsee, against the payee and first indorser, who has pleaded an usurious contract between the maker and last indorsee. The defendant released the maker from all liability to him, and offered him as a witness to prove the usury. The circuit court decided that he was incompetent, and would not admit him to testify to the usury; and the question is, whether the circuit court was correct in this opinion.
Should the plaintiff fail to recover in this action, he may resort to the maker, notwithstanding the release of the payee; therefore, the maker is interested that the plaintiff shall recover, for then he, the maker, will be forever discharged, both as to him and as to the payee, and in invalidating the note he swears against his own interest; he cannot, therefore, be objected to by the plaintiff on the score of interest in the event of the suit.
But it is said, that he is objectionable on the ground, that “no one shall he allowed to prove his own turpitude.” This maxim only applies, where in pleading the allega *37 tion is made of criminal or immoral matter, to support an action or defence. Such allegation if made would destroy the action or defence founded upon them, and in this respect the party alleging his own turpitude would not he heard with effect.
Criminal or immoral matter may be alleged in destruction of a right claimed, and of course may be proved; and generally speaking, he who is “particeps criminis,” may swear to it, though in so doing he alleges his own turpitude.
Another supposed rule is resorted to which is, that a man shall not by his own oath invalidate an instrument he has signed, and given currency. Admit for a moment that such was the common law, it would certainly give way to the statute of usury. The only question would he, whether the rule conflicted with the statute,— now the statute of usury provides, that it shall not he evaded by any shift or device whatever. Would it not he an evasion, if the contract could he so made as to he known only to the indorsee and maker, if the latter could not he a witness? Either he must be a witness when disinterested, or the statute would be in most cases illusory. To render it effectual, construction should break down any real or supposed obstacles opposed to it by the common law, and such have been judicial determinations. The British statute provides that the instrument infected with usury shall be utterly void; the courts decided that it should be void as to all persons, innocent indorsees as well as others, though the common law protected innocent indorsees without notice. The rule then for supporting the instrument, and protecting the indorsee, yields to the statute, notwithstanding the policy which requires that an instrument shall not he invalidated by him who signs it. He may, if sued, allege and prove the usury, and invalidate the note in the hands of an indorsee for value without notice'. If such defence were forbidden by public policy, the maker of a note would not be allowed to plead it — if permitted to plead or allege it, he must be permitted to prove it, and if by another’s oath, the same law that tolerates the plea, will also tolerate the oath.— *38 The statute breaks down the obstacles opposed to it wholly, not in part only. It is incongruous to say that the statute shall prevail, therefore plead the usury, and next ¿o say that the common law shall prevail, therefore the maker shall not swear — or in other words, that the statute shall prevail in part, and the common law in part: whereas they cannot stand together, and either one or the other must prevail, which no doubt must be the statute.
But indeed if we enquire whether there ever was such a rule at the common law, that he who made an instrument shall not be permitted to invalidate it by his oath, we will not be able to find it. From 2 Ld. Raymond 1008, it is evident there was no such rule as to deeds, and we find in 7th Term Reports 601, that there is no such rule as to negotiable instruments. I am warranted in saying (by the final determination of the Judges of England, after eleven or twelve years examination of the subject,) that no such rule existed in England at any time either before or after the revolution.
There is not that danger to commerce, which is supposed tobe obviated by the rule contended for. Are we more commercial than England was at the time of the decision of Jordan vs. Lashbrooke, 7 T. Rep. 601? Was commerce injured in that country by the decision? There is not so much danger to commerce as is apprehended. Modern experience has proved that excessive usury ruins commerce, and that the punctuality which begets usury, is not the effect of easy circumstances, but of an agonizing struggle to maintain an expiring credit. I am perfectly satisfied, that John Stump was an admissible witness under the circumstances, and that there is error in the judgment of the circuit court, for which it ought to be reversed.
Whyte, Judge. This case presents this question to the court for its opinion: whether John Stump, the maker of the note, is an admissible witness in law, to prove that it was given on an usurious consideration, having no interest in the event of the suit*
This case has been very ably argued on both sides. Upon *39 its argument, (as upon all other occasions where the ques-fion has been presented,) the case of Walton & Shelly, 1 Term Reports, 296, has been cited and much commented upon. As it stands alone in the courts of Weslmins-ter Hall, it has been endeavored to support its authority by its own internal evidence, as recognizing an existing rule of the common law. This evidence consists in the court and counsel in that case, speaking of its principal point, as a well known rule. Now, whatever respect we attach to so great a name as that of Lord Mansfield, (and we cannot attach too much,) yet we must not permit ourselves in rendering this tribute to talents, to overlook all others, and thus commit an act of injustice to other names, also great. Lord Kenyon and his associates, in ihe case of Jordan and Lashbrooke, 7 Term Reports, 597, deny as broadly the existence of any such rule of the common law, as Lord Mansfield and the other judges in Walton & Shelly, have asserted it; and Lord Kenyon’s is a great name upon a point of common law, independent of his decisions, which speak for themselves. A late writer of respectability in the United States has not hesitated to say, that Lord Kenyon was the ablest common law judge that sat in Westminster Hall, since the time of Lord Hale.
But admitting for the present, the claims of these two cases for correctness to be equal, without reference to the reason of them, which we will examine by and by, the point in issue between them, is very susceptible of proof.
The main ground upon which the .rejection of the testimony in the present case is rested, is, the inconvenience and the danger that will result to the public thereby; that the admission of the witness will stop the currency of negotiable paper, destroy confidence and eventually and necessarily paralyze the industry of the country.Particular cases of inconvenience might be put, and that even to some extent on either side, to show that the bearing of either doctrine would operate somewhat injuriously to the party affected. But were it a criterion of the correctness of a rule of law, that its application in all ca *40 ses whatever, should be exempted from this effect, few if any rules could stand such a test, and the consequence would necessarily be, that in practising upon such a prin-ciplej the whole fab rick of the law would be overturned: for such objections might be 'raised against the best acknowledged doctrines of the law.
Now, what is the hardship of the rule, of admitting the party to the instrument, (the maker of the note in the present case,) to be a witness to prove it void? The lessen-ings it is said, the security of an indorsee. Place the argument in the strongest position possible, and suppose this indorsee to be the holder of the note for full value paid by him, and that without notice of the previously existing illegality of the transaction; his case is not desperate — he has recourse to, and a remedy against, his immediate indorser. But it is said, that this immediate indor-ser may be insolvent; then I say it is the holder’s own fault,his own laches, or his own want of prudence: for by his attention to the circumstances of his immediate in-dorser, he may be always safe; and in the nature of things, the full and sufficient competency of his immedi-' ate indorser, ought to be the principal consideration of every indorsee, or holder: for with him he must have the transaction and the dealing. All the other parties may be absent or resident of another place, or even of another country and to him unknown; but with the immediate indorser he must come in contact of necessity, and has the same means of protecting himself, and guarding against the operation of future contingencies, that the parties to all other contracts have when there may be a defect to title. Placing the fair, the honest, the bond Jide holder’s case, in the worst possible point of view for him, I cannot see its imperious hardship to be such, as to controvert the general policy of the law. But place this indorsee or holder, in a less favorable point of view, as the fact oftentimes is, will the same reasoning apply? Suppose he has not given a single cent for the instrument, and has only lent his name as an accommodation indor-ser, and contributed thereby to the raising a structure, *41 ássüming the form, but false in fact, as wanting the substance contemplated by law, and presumed to exist. I say in this view, what are his merits? What ought to be his claims? He is the contributor to a baseless fabrick that hangs out false colors, that imports to be what it is not, that is founded on falsity, and so far imposes on mankind; he surely ought not to complain. Such a practice is contrary to the natural order of things, as shrouded in disguise and contrary to sound policy, and as injurious in its tendency; Lord Eldon has observed in 11 Ves. Junr. 412, that the use of them, when there is no real demand between the different parties, is injurious to the public as well as to the parties concerned in the negotiation; A late learned writer has also on this point remarked* that the pernicious effects of a fabricated credit, by the undue use of accommodation bills of exchange, drawn out of the ordinary course of trade, have been too much felt to require any observation — Chitty on Bills, 5.
But let us resume the better case for the indorsee* that the whole transaction, instead of being superficial* is wholly real, and that full consideration has passed between all the parties, only that usury exists in the first transaction, which was the consideration for the maker of the note, (the witness) to give the instrument; and let üs see, whether from the law, and the reason of the law operating on the interests of society, the indorsee’s situation has the stronger claims to the exclusion and concealment, or the situation of the party injured, to the development and' discovery of the usurious transaction.
As to the law — usury, or the taking interest of any kind, seems to have been deemed unlawful in early times. Lord Coke, in his 3 Inst. 152, says, “by the ancient law of this realm, usury was unlawful and punishable, although the punishment was not always one, but sometimes greater and sometimes lesser;” and he shows from the laws of King Alfred, that the chattels of usurers were forfeited to the king, and their lands escheated to the lord of the fee. And he points out the different alterations made therein by statute from the Norman Con *42 quest down to the 2d of Edward I, and says, “by which it appears, that the suppression of usury tendeth to the honor of God, and the common profit of the people.” He íhen goes on an(j shows, that the statute of 37 Henry VIII, the 13 Eliz., and the 21 Jac. 1, have done away all former statutes, and the common law upon the subject of usury; and have placed it upon the provisions of these statutes; where it rested in the latter part of Lord Coke’s time, and so continued until the 12 Charles II, the last act before the colonization of North Carolina on the subject, and which it is not necessary to notice further, as the Colonial act of 1741, ch. 11, in its provisions and practice, supersedes all former English statutes. I have taken this short review to show the light in which usury has been held by those who have gone before us, from the time of passing the act of 1741, up to the time of the highest antiquity in the annals of our laws: from which I collect this result, that usury in the eye of the law, never has been favored, but always held illegal and discountenanced by it, as being of evil tendency, contrary to good morals, and injurious to the interests of society at large. Thus we find, that the law from its earliest period, down to the present time, has had but one opinion about usury, and that has been uniformly against it, though its expression has been different atdiffei’ent times.
Now, what is its operation on society? In addition to the evidence of all ages,-if more could be required, we do not see from our own observation of the present times, that the immediate pressure of circumstances, acting on the distresses of the unfortunate or the unwary, raises the delusive hopes of avoiding the impending evil by a future sacrifice, which the very act he wishes, (the usury,) renders him unable to make, and that the interested assistance his wants and his necessities compelled him to court, proves his ruin; which, had it been withheld, might have heightened at the time his embarrassment, but would have eventuated far short of his ruin. But this is not all; the practice operates, not to the prejudice of the unfortunate principal alone — from the infiu *43 ence of the social and better affections of our nature, overcoming the calculations of our judgment, securities are carried along the current of compassion, and die spread of calamity preys on the distresses of families in an inverse ratio to what their amiable qualities have deserved.
It seems, therefore, to me, lhat the greater interests of society require the development and exposure of an usurious case, rather than its concealment — that the mis-chiefs resulting from its practice to the unfortunate, tho’ willingparliceps, or rather victim crimmis, as he might be more properly called, are much greater, more injurious, and more certain in their operation, than on the innocent indorsee, whose loss can only in general be casual, and in all cases may be avoided by common prudence. And further, that this, its discovery, is more consonant to the principles of law; the injunctions of which ought to be respected, and its infractions detected and punished.
The injurious consequences that might result to society, from the enforcement of the rule, “that a party to a negotiable paper may be admitted to impeach it,” have been much dilated upon in the argument, and they have been represented so formidable thereby, as not only to be able to interpose a check, but to operate as a veto against the circulation of such paper. I cannot, for my part, see it in this light. In England, where this rule has prevailed e(ver since the year 1797, we find no such effects from it. We find not even a complaint against it. Is not this ample proof, that these hypothetical consequences, so warmly depicted at the bar, are purely imaginary, and never will be realized? Let it be remembered also, that England is a country highly commercial— that she has always been alive to her commercial interests — that towards them she has always manifested much feeling; they have always been the first objects of her care 5 and yet according to the argument, that this rule directly and immediately impugns her best interests, she has slept for twenty-three years without noticing it. It cannot be possible that the argument is well founded, or the con> *44 mercial interest of England would have instantly taken alarm, and applied a corrective by legislative interpo-* sition, as was done about one hundred years before, when Lord Holt in the case of Buller vs. Crisps, decided that promissory notes were not within the custom of merchants, and that an action of debt could not be maintained upon them as such, although in fact it had been the practice, and that coeval with inland bills of exchange, to bring such action, and was so determined in the case of Williams vs. Williams, 5 W. & Mary, in the King’s Bench, and thatjudgment afterwards upon error fn the Exchequer Chamber, affirmed by all the judges; Carthew’s Rep. 269; 1 Cranch, 395, 6, 7. The statute 3 and 4 Anne, ch. 9, making promissory notes negotiable as inland bills of exchange, and putting them on the same footing, was instantly passed. Now does it not follow, that if England when much less commercial than at present, and much Jess dependent on commerce than she now is, did act so promptly and efficiently when a slight judicial invasion was made on the custom of merchants, — r I say, does it not amount to demonstration, that the law established by Jordan vs, Lashbrook had no tendency that way, or it would immediately have received the treatment of Buller vs. Crisps, by statutory interference?
From these premises, I am fully satisfied, that the commercial interest of the country is in no wise endangered by the admissibility of John Stump to prove the note he had made was founded on an usurious consideration; or that the credit or currency of negotiable paper will be the least impaired, by saying that a party to such paper may, when not interested, impeach it; but on the other hand, its effects will be to add confidence and security to it.
The act of 1741, ch. 11, says, that all usurious contracts shall be utterly void — it must be void in the hands of an indorsee, as well as the original parties, or effect is pot given to the act; neither its letter or its spirit will be complied with, if the proof offered is excluded. The act *45 is defeated and rendered almost nugatory, contrary to the ... . , intention so strongly expressed m it.
I shall now proceed to see whether this proof is admissible or not upon common law principles. At the outset of the enquiry, the cases of Walton vs. Shelly and Jordan vs. Lashbrook, primarily and naturally present themselves to our notice, not as authorities binding on this court, which no case in Westminster Hall since the revolution is, but as the respectable opinions of learned judges; men deeply versed in the laws of their country, and as existing evidence of what the common law was previous to the revolution, which, when applicable, is common to us with them.
Lord Mansfield, in the first of the above named cases says, the rule of law, founded on public policy, is, that no party who has signed a paper or deed, shall ever be permitted, by his testimony, to invalidate it; 1 T. Rep. 300, Next to the matter of this position, what attracts our attention the most is, the stating it to be a rule, when this is thefirst .mention of itin any case whatever. The manner of expression imports the previous existence of it, as a matter well known, and understood to be so by all interested in the knoweldge of such things. But when we look for it out of the bounds of that case, we are disappointed, and our search is in vain. It has been urged, that the admission of the bar in the case of Walton vs. Shelly, is the strongest evidence of the existence of the rule; on which I would observe, that another admission in Jordan vs. Lashbrook, operates as much the other way. Mr J us-tice Laurence, in his opinion in the latter case says, f‘Wallon and Shelly is undoubtedly a case of great authority, but it was admitted in the course of the argument, that no such determination is to be found earlier than that case; therefore it must depend upon its being supported by the general principles and rules of law applicable to the admissibility of witnesses.”
If in the space of twenty years, the assertion by Mr. Justice Laurence, that no such determination can be found earlier than Walton vs. Shelly, stands unrefuted, *46 I think we may now say, that the law of that case rests upon itself, and must stand or fall, as it is supported or opposed by the well known principles of the common jaw jn similar cases. It is directly opposed to the case in Blk. Rep. 365, where the witnesses to a will were permitted to give impeaching testimony against it. But a distinction is attempted to be drawn between the case of an instrumentary witness, and a party to the instrument; for my part I can see no difference in the application of the principle. Let us draw the parallel, and apply the test as laid down in Walton vs. Shelly. Does not the in-strumentary witness by the act of signing his name as a witness to the paper, deed or will hold forth to the world that what he hath signed, is what in fact it purports to be? Does not the maker of a note, obligor in a deed áse. do the same thing? Does not the witness by his attestation say that the promissor executed the note,or the obligor the deed, which he hath attested, and does not his signature say the very same thing, that this is my act, or this my deed or will; and if the note, deed or will at any time of its execution is void by reason of gaming, usury or infancy, and this is known to the witness (and he must have the knowledge or he cannot impeach it) does he not come within the reason of the rule or test in Walton vs. Shelly, and hang out false colors to deceive mankind? What more does the maker of the note, or the obligor in the deed? He docs precisely the same thing. Do not both equally say this is a valid instrument? And if it is not, do they not both equally hang out false colors to the community? Does not the witness give credit to the security by signing it as a witness? Does he not thereby hold out to the world that it is genuine? Surely he does, and the party does no more. No difference then can be perceived in the principle of the two cases; both assert what is not true; both give credit to the instrument or paper; and both hang out the same false colors to the world»
Of like import with the case of Lowe vs. JolefFe, is the case of Pike vs. Badmerring, on a trial at bar in the time of Lord Chief Justice Pratt, where the three subscribing *47 witnesses to a will, were called in, and denied their signatures; the court admitted the plaintiff to contradict their testimony,and he supported the will against their evidence; 2 Strange Rep. 1096.
The case of Rice vs. Oatfield, is another application of the same principle, upon different facts; there the lessor of the plaintiffproved that his father had renounced theer-rorsofthe church of Rome in 1716,and died in 1720, leaving him his heir; defendant inoppositionproved the father devised to him in 1720. Plaintiff then offered to prove that his father died a papist; the defendant objected to the evidence, arguing that the plaintiff would not be admitted to contradict his former evidence, but the judges received it, and upon error the judgment was affirmed; 2 Strange 1095.
So in the case in Lord Raymond 1008, it was ruled that a man who conveys land may be a witness to prove he had no title, because that is swearing against himself, but he is not compelled to give such evidence. Now no difference can be perceived between the case in Lord Raymond and the present case: — he who conveys land gives credit to his deed; if he had no title he hangs out false colors, and thereby deceives mankind, and when he proves he had no title, he gives evidence to invalidate the instrument he had executed. The strongest-foundation assigned, upon which to exclude the witness in this case, is placed by the case of Walton vs. Shelly, upon the maxim of the civil law,“JVemo allegans suam turpitude nem est audiendus.” But the application of this maxim to witnesses is unknown to the practice of the common law, as also to its reason and policy. That it may have an application to the parlies in a suit in some cases, Mr. Justice Gross admits, in his opinion in Jordan vs. Lash-brook; and this application of it Lord Mansfield himself has made elsewhere, where he has observed a man must come into court with clean hands, and he must draw his justice from the purest fountains. Let itbe admitted,then, that a plaintiff shall not be permitted to iound a right on an illegal consideration, or ground his claim upon a trans *48 action which is fraudulent, or grossly immoral; or, if a defendant he shall not found his defence on such a basis, yet this admission of the maxim must stop far short of a general rule, and be much restricted in its application; for in controversies where both parties are equally guilty; the ruléis,potior est conditio defendentis.” Mr. Justice Laurence says, persons are continually permitted suam allcgans turpitudinem,” as in cases of simony, compounding felony, &c. and he adds, that possibly that maxim may in law be confined to the cases of plaintiffs making demands “e® turpi causa,” and to such cases of defence in which innocent persons may be prejudiced.
The application of this maxim to witnesses is contrary to a sound principle of the common law, which is, that the exclusion of truth is always discountenanced upon all occasions; and courts endeavor as far as possible consistently with former decisions, to receive the testimony of witnesses, leaving it with the jury to consider how far it has been supported by other evidence, or from its own character may be entitled to credit; see Phillips on Ev. 35.
That it is contrary to the reason, policy and practice of the common law, is evidenced by the constant admission of accomplices in crimes to give testimony, the law permitting their testimony to go to the jury, to be weighed by them, and believed, or disbelieved according to circumstances: even a witness who by his own showing proves himself to have been guilty of perjury, will not be rejected; 11 East 310.
From all which it seems to me, that by no rule of evidence of the common law is this testimony excluded.— By the evidence of the common law, I mean our own precedents, practice and reports, and the English reports and other books usually considered the depositories of the common law before the revolution, making in all cases the necessary allowances for its applicability, and suitableness to our situation.
Cases from different States of the Union have been cited on the argument. Those from New York, Massachusetts and Pennsylvania show that a party to a nego- *49 liable instrument is incompetent to prove it to have been originally void. In Connecticut, in a íate case where the court have taken á very extended view of the subject in a variety of aspects, they have solemnly decided the law the other way. In the remaining states, the point has not been decided; but in some of their reported cases, there are expressions bearing on the principle, inducing a belief, that were the question to come before them, the decision Would be as in Connecticut; ánd even in those states where the rule of Walton and Shelly prevails, they exclusively limit it to negotiable instruments. In Pennsylvania, the obligee and assignor of a bond was admitted to show he obtained it fraudulently, although the bond was made assignable or negotiable by act of Assembly. 2 Binney 165.
In New-York, the decision was first carried in 1802, by a bare majority in a court of five Judges, Kent being in the minority. 3 John, cases 185. In Massachusetts, the rule was adopted soon after the decision in Walton vs. Shelly, as appears from 3 Mass. Rep. 28; and subsequent decisions conformed to it. In the case from 4 Mass. Rep. 160, Parsons Ch. J. in delivering the opinion Of the court, after reviewing all the English cases on the subject, notices a decision of his own court, made about twenty years before that time, and states that it had uniformly been adhered to: from all which it would rather seem to me, that if the question were to come before these courts at the present day, unshackled by former decisions, it would perhaps receive a different determination.
To this court the question is now presented tor the first time upon a negotiable paper, though we have decided it in substance at the last Knoxville term in the case of Willie’s lessee vs. Calloway, (a) The point in that case was, whether the grantor in a deed of land, when not interested, could be permitted as a witness to impeach it on the *50 ground of fraud: we decided the witness to be cornpe-tent. A distinction is drawn when the rule excluding witness prevails, between a party to a deed or other instrument not negotiable, and a negotiable paper; but to me the distinction has always seemed more nominal than real, the principle being the same in both.
Were there a general concurrence of decision in the other States, one way or the other, I should think it my duty to conform thereto, upon the principle of raising upa judicial system of unanimity upon common law questions among all the parts or members of one great whole, the Union. But as the expression of my opinion will not effect this object, which way soever it be given, I think it my duty to declare my own opinion, founded on common law principles, to the best of my judgment, and thereby contribute my mite to what I consider this general and uniform rule ought to be. Emmerson, Judge, concurred.
Judgment reversed, (a)

 Ante page 1.

 The rule as laid down in Jordan vs. Lashbrook has been recognized and settled in Connecticut and North Carolina, Swift’s Ev. 96, 105. Townsend vs. Bush, 1 Connecticut Reports 260. Guy vs. Hale, 3 Murphy’s Rep. 150. But in New-York, Pennsylvania, South Carolina, Massachusetts, and New-Hampshire, the contrary rule as to negotiable instruments seems to prevail. Winter vs. Saidler, 3 John. Cases 185. Coleman vs. Wise, 2 John. Rep. 165. Skelding vs. Warren, 15 John. Rep. 270. Houghton vs. Page, 1 New-Hampshire Rep. 60. Warren vs. Merry, 3 Mass. Rep. 27, Churchwell vs. Sutor, 4 Mass. 156. Still vs. Lynch, 2 Dallas’ Rep. 194. Shaw vs. Wallace, 2 Yeates’ Rep. 17. Croft vs. Arthur, 3 Dessausure 223. Vide also B. U. States vs. Dunn, 6 Peters’ Rep. 51